UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 1:CR-02-147 |
| | : | |
| -v- | : | |
| | : | (J. Kane) |
| TIMOTHY J. NOONAN | : | |

**INFORMATION**

**The U.S. Attorney Charges:**

**INTRODUCTION**

*Rite Aid Corporation*

1. During all time periods encompassed by this Information, Rite Aid Corporation, hereinafter referred to as "the Company," was a publicly held corporation duly organized and existing under the laws of the State of Delaware. Incorporated in 1968, its primary business was the operation of retail drug stores. The Company also engaged in pharmacy benefits management, the marketing of prescription plans, and managed health care services. Rite Aid's headquarters and senior executive offices were located at 30 Hunter Lane, Camp Hill, Pennsylvania. Most of its accounting department personnel were located at a separate facility in Valley Green, PA.

2. As a publicly owned corporation, Rite Aid's stock was traded on the New

York Stock Exchange. As of May 10, 1999, the Company had more than 258 million outstanding shares of common stock.[1] The Company also sold short term notes (commercial paper) and other securities to the public.

*The Board of Directors*

3. Rite Aid was governed by a Board of Directors, which consisted of 8-9 members serving staggered, three-year terms. The Board regularly met 4 times a year and usually had 5-6 "Outside Directors," who were not corporate officers. The Board had various Committees, including an Audit Committee and a Compensation Committee, each of which were composed of 3 Outside Directors. The Audit Committee oversaw management's financial reporting responsibilities and the Company's maintenance of appropriate internal control systems. The Compensation Committee reviewed the performance of the Company's executive personnel and made recommendations to the Board with respect to executive compensation policies.

*The Top 4 Corporate Officers*

4. The top 4 corporate officers at Rite Aid between March of 1995 and October of 1999 were MARTIN L. GRASS (GRASS), TIMOTHY J. NOONAN, FRANKLIN C. BROWN, and FRANK M. BERGONZI. GRASS was appointed Rite Aid's Chief Executive Officer (CEO) and Chairman of its Board of Directors on March 4,

---

[1] All references to numbers of shares in this Indictment reflect the February 2, 1998, two for one stock spilt.

1995, the beginning of its 1996 Fiscal Year.[2] Prior to his appointment, GRASS had been the Company's President and Chief Operating Officer (COO) since 1989, a member of the Board of Directors since 1982, and a corporate officer since 1980. GRASS is the son of the Company's founder, Alex Grass.[3] GRASS served as CEO and Chairman of the Board from March 4, 1995, until his resignation was announced on October 18, 1999.

5.  At the time of GRASS' promotion to CEO on March 4, 1995, Timothy J. NOONAN became Rite Aid's President and Chief Operating Officer (COO). NOONAN also became a member of the Board of Directors at that time. Prior to that, NOONAN had served as the Company's Executive Vice President and had been a corporate officer since 1973. NOONAN served as Rite Aid's President, COO, and as a member of its Board of Directors from March 4, 1995 until October 18, 1999. Between October 18, 1999, and December 5, 1999, NOONAN served as the Company's Interim Chief Executive Officer. NOONAN resigned from Rite Aid employ on February 25, 2000.

6.  On March 4, 1995, FRANKLIN C. BROWN was Executive Vice-President, Chief Legal Counsel, and had been a member of the Board of Directors since 1981. Prior to his appointment as Executive Vice President in April of 1993, BROWN served the Company for 13 years as Senior Vice President and General Counsel,

---

[2] Rite Aid's fiscal year ends on the Saturday closest to Feb 28 or March 1.

[3] Alex Grass retired as Chairman of the Board and Chief Executive Officer on March 4, 1995, positions he held since the founding of the Company. However, Alex Grass continued to serve as a member of the Board of Directors until 2001.

and as a corporate officer since 1969. BROWN served as Executive Vice President, Chief Legal Counsel, and as a member of the Board of Directors until July 9, 1997, when he was promoted to Vice Chairman of the Board of Directors. Thereafter, BROWN resigned as an employee of Rite Aid on February 25, 2000, and as a member of the Board of Directors on May 29, 2000.

7. On March 4, 1995, FRANK M. BERGONZI was promoted to Executive Vice President and Chief Financial Officer (CFO) of the Company. Prior to that BERGONZI had served as Senior Vice President of Finance and as a corporate officer since 1977. BERGONZI became a Certified Public Accountant (CPA) in Pennsylvania in 1970, but his certification expired in 1983. BERGONZI served as Executive Vice President and CFO from March 4, 1995 until January 13, 1999, when he was promoted to Senior Executive Vice President and CFO. BERGONZI served as Senior Executive Vice President and CFO until June 14, 1999, when he resigned his position as CFO. Thereafter, BERGONZI maintained his office at corporate headquarters where he worked in an untitled capacity until his retirement on or about October 18, 1999.

8. As Rite Aid's four highest and most senior officers, GRASS, NOONAN, BROWN and BERGONZI directly participated in the day-to-day management of the Company and, as such, were privy to all pertinent information regarding Rite Aid's business operations, accounting, and finances. As Rite Aid's four most senior officers, GRASS, NOONAN, BROWN, and BERGONZI owed fiduciary obligations to manage

the Company's affairs honestly and to provide complete and candid information to Rite Aid's directors, shareholders, and investors. GRASS, NOONAN, BROWN, and BERGONZI were duty bound to provide truthful, complete and accurate information to Rite Aid's accountants, auditors, and government regulators, and had statutory duties to disseminate accurate information with respect to the Company's true financial condition and earnings.

### *Rite Aid's Financial Statements and Earnings Reports*

9. Between March of 1995 and October 18, 1999, GRASS, NOONAN, BROWN, and BERGONZI caused Rite Aid financial statements that purported to conform with GAAP and the applicable regulatory requirements to be prepared and filed in Quarterly and Annual Reports with the United States Securities and Exchange Commission (SEC). The Quarterly (Form 10-Q) and Annual (Form10-K) Reports, which were signed by GRASS, NOONAN, BROWN, and/or BERGONZI, included acknowledgments that management was responsible for the preparation, integrity and objectivity of the financial statements, along with representations that they were prepared in conformity with Generally Accepted Accounting Principles (GAAP).

10. In these financial statements Rite Aid portrayed itself as a financially robust company with sustained economic growth between FY 1996 and FY 1999. Net income for FY 1996 and FY 1997 exceeded $158 million and $116 million, respectively. According to the Reports, net income more than doubled in FY 1998 to $316 million. In

the Company's FY 1998 Annual Report GRASS boasted that Rite Aid just completed "the most ... profitable year in the history of our Company."

### *The Price of Rite Aid Stock*

11. As a consequence of the financial statements filed and earnings announcements made by GRASS, NOONAN, BROWN, and BERGONZI, the price of Rite Aid stock soared. Between March of 1995 and February of 1999 the Company's stock price rose by more than 306%, an increase more than twice that of Standard and Poor's 500 stock index. On March 3, 1995, the price of Rite Aid stock closed on the New York Stock Exchange at $12.81. Two years later on March 3, 1997, the price was at $21.75. By July of 1998 the price hit $40 a share. That year Rite Aid was named by *Business Week* as one of its 50 top-performing companies and by *Fortune* magazine as one of "America's Most Admired Companies." On January 8, 1999, the Company's stock closed at its all time high of $50.94 per share. To illustrate the dramatic increase in the price of Rite Aid stock between 1994 and 1999, as compared to the rest of the retail store industry, Rite Aid included the following chart in the Company's 1999 Proxy Statement:



**STOCK PERFORMANCE GRAPH**

The graph below compares the yearly percentage change in the cumulative total stockholder return on the Common Stock for the last five fiscal years with the cumulative total return on the S&P 500 Index and the S&P Retail Stores Composite Index over the same period (assuming the investment of $100 in the Common Stock and such indices on February 26, 1994 and reinvestment of dividends).

For comparison of cumulative total return, the Company has elected to use the S&P Retail Stores Composite Index, consisting of 35 companies including the six largest drugstore chains. This allows comparison of the Company to the peer group of similar sized companies used by the Committee in its evaluation and determination of executive compensation.

|  | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|
| Rite Aid Corp. | $100 | $133.10 | $173.74 | $237.77 | $370.99 | $479.41 |
| S&P Retail | $100 | $91.47 | $100.92 | $124.14 | $189.91 | $278.91 |
| S&P 500 Index | $100 | $107.35 | $144.56 | $182.36 | $246.17 | $294.77 |

* The Company's fiscal year ends on the Saturday closest to February 29 or March 1.

## *Rite Aid's Internal Investigation*

12. On October 18, 1999, the Company issued a Press Release announcing GRASS's resignation as Chairman of the Board and Chief Executive Officer, that Tim NOONAN would serve as Interim CEO, and that it expected a restatement of its FY 1997-1999 income to total, on a pre-tax basis, $500 million. With GRASS' resignation, BERGONZI immediately ceased working at Rite Aid. On November 11, 1999, KPMG announced it was resigning as Rite Aid's auditor and withdrawing its opinions with respect to Rite Aid's FY 1997-1999 financial statements.

13.     On December 5, 1999, Rite Aid announced a new senior executive management team, one with no previous ties to the Company, had been hired.[4] That month the Board of Directors launched a massive internal investigation into the Company's accounting and financial reporting. A New York law firm (Swidler, Berlin, Shereff, & Friedman, LLP) was retained to conduct the probe. A new public accounting firm, Deloitte & Touche, LLP, was hired to replace KPMG. The forensic accounting team at Deloitte & Touche was also engaged to help review and reconstruct the Company's books and records.

### *The $1.6 Billion Dollar Restatement*

14.     The internal investigation lasted nearly 8 months and entailed more than 80 interviews of current and former Rite Aid employees. After the results were presented to the Board, the Company filed its Annual Report for FY 2000 with the SEC on July 11, 2000. The filing included a comprehensive Restatement of Rite Aid's financial statements for FY 1998, FY 1999 and the 1st Quarter of FY 2000.

15.     The Restatement was the largest restatement of corporate income in the history of the United States. The filing fixed FY 2000 as a *$1.133 billion loss*, FY 1999 as a *$461.5 million loss,* and FY 1998 as a *$165.2 million loss.* Although the Restatement did not specifically address net income for FY 1996 or FY 1997, it reduced retained earnings for all years prior to FY 1998 by an additional $547.1 million. As such, the Restatement effectively eliminated all profits originally reported by Rite Aid between FY 1996 and the

---

[4]NOONAN and BROWN retired from Rite Aid employment in February of 2000.

1st Quarter of FY 2000. The following table compares the Company's originally reported net income to the July 11, 2000 Restatement:

|  | *Net Income As Originally Reported* | *Net Income (Loss) Per July 11, 2000 Restatement* |
|---|---|---|
| FY 1998 | $316.4 million | ($165.2 million) |
| FY 1999 | $143.6 million | ($461.5 million) |
| 1st Q FY 2000 | $81 million | ($43.7 million) |
| **Total** | **$541 million** | **($670.5 million)** |

### *Other Crimes*

16. Beyond massive accounting fraud, Rite Aid's internal investigation uncovered substantial evidence GRASS, BROWN and BERGONZI had perpetrated other offenses, including Conspiracy, 18 U.S.C. § 371, Mail Fraud, 18 U.S.C. §1341, and Wire Fraud, 18 U.S.C. §1343, in the course of their scheme to manipulate the Company's earnings. Among other crimes, the investigation revealed a scheme to defraud Rite Aid's vendors out of millions of dollars and a scheme to defraud the Company via GRASS' issuance of back-dated severance letters after GRASS no longer was employed by Rite Aid.

### *The Upcharge*

17. In order to inflate the Company's reported earnings, the senior management of Rite Aid devised schemes that defrauded Rite Aid's vendors. As a major retailer, Rite Aid did business with thousands of vendors and suppliers, spending billions each year on pharmaceutical and consumer goods. Rite Aid had different agreements with its vendors

regarding damaged and outdated (D & O) merchandise. Most allowed Rite Aid to take a D & O deduction against future payments without returning the goods to them or a third party. These vendors relied upon Rite Aid providing a monthly statement that accurately reported the quantities of D & O product removed from Rite Aid's stores.

18. With GRASS, NOONAN, BROWN, and BERGONZI's knowledge, approval and direction, Rite Aid arbitrarily inflated the quantities of damaged and outdated goods it reported to its vendors between FY 1995 and FY 1999. Known as the "Upcharge," the percentage of inflation was approximately 35% in FY 1995. At the beginning of FY 1999 the Upcharge was increased to 50%.

19. The Upcharge was never disclosed to the vendors, who were unaware Rite Aid was systematically defrauding them. The Upcharge had a significant impact upon the Company's financial statements, allowing Rite Aid to claim and deduct approximately $53.1 million in additional, bogus D & O credits between FY 1995 and FY 1999. More than half of that amount, $27.8 million, was recorded on the Company's books and records during FY 1999.

*The February 23, 1999, Chargebacks*

20. In late February of 1999, just before the close of FY 1999, GRASS, NOONAN, BROWN, BERGONZI and their co-conspirators devised yet another scheme by which to inflate Rite Aid's earnings by defrauding its vendors. During the summer of 1998 the Company decided to discontinue carrying a large quantity of goods, much of which

were acquired in the Thrifty Payless acquisition. Known as non-go-forward product, the goods were sold at substantial markdowns in clearance-type sales.

21.     Despite the fact there were no prior vendor agreements in place for sharing these costs, and despite the fact the amount charged was merely estimated as a percentage of each vendor's annual sales, GRASS, NOONAN, BROWN, BERGONZI and their co-conspirators caused Rite Aid's Category Management and Accounts Payable departments to bill the vendors for the markdowns. The invoices, all of which were dated February 23, 1999, falsely described the chargebacks as deductions for damaged and outdated goods. As a result, $29.7 million in additional bogus vendor credits were booked as income for FY 1999.

### *The Back-dated Severance Letters*

22.     During the Summer of 1999, as Rite Aid's finances began to fail and GRASS endeavored to sell the Company, GRASS gave highly lucrative, back-dated severance and enhanced deferred compensation benefit letters to several officers. This aspect of the fraud against the Company did not end with GRASS' resignation. Sometime *after* his resignation on October 18, 1999, GRASS and BROWN prepared at least 3 letters bearing GRASS's signature on Rite Aid letterhead and caused them to be delivered to Tim NOONAN, Eric Sorkin, and another Rite Aid employee. The letters, which were back-dated to dates when GRASS was the Company's CEO, granted the recipients millions in enhanced severance and deferred compensation benefits.

23.  With respect to NOONAN's back-dated letter, GRASS signed and BROWN delivered the letter, which was prepared on GRASS' CEO letterhead and dated January 8, 1999, to NOONAN in December of 1999. In addition to stock option exercise rights, the back-dated letter granted NOONAN continued salary and his highest annual bonus for 3 years following his termination or removal from the Presidency of Rite Aid, followed by deferred compensation benefits for 20 years beyond his 65th birthday. At the time NOONAN received the letter he was 58 years of age, his annual salary was $700,000, and his highest bonus had been $628,600. However, NOONAN never submitted the letter to the Board of Directors and ask that it be honored..

*Noonan's Misprison*

24.  While the Company was actively engaged in the course of its internal investigation, GRASS and BROWN met with NOONAN on several occasions between March and July of 2000 at various locations in Pennsylvania and Maryland. During these meetings GRASS and BROWN encouraged NOONAN to withhold material information regarding the criminal activities that had taken place at Rite Aid from the internal investigators. As a result, NOONAN did, in fact, withhold key information regarding, among other matters, Rite Aid's accounting fraud, vendor fraud, and the back-dated severance letters, when he was interviewed by the internal investigators on March 16, 2000, March 30, 2000, and July 27, 2000.

## COUNT ONE
(Misprision of a Felony)

25.     Between March 16, 2000, and July 27, 2000, in the Middle District of Pennsylvania and elsewhere, the defendant,

**TIMOTHY J. NOONAN,**

having knowledge of the actual commission of a felony cognizable by a court of the United States, to wit; Conspiracy, Mail Fraud, and Wire Fraud, as set forth above, did conceal same by intentionally withholding and concealing material information regarding these offenses during interviews with Rite Aid's internal investigators, and did not as soon as possible make known the same to some judge or other person in civil or military authority under the United States.

**All in violation of Title 18, United States Code, Section 4.**

_Thomas A. Marino_ BY MC
THOMAS A. MARINO
United States Attorney
Middle District of Pennsylvania

DATE: 6/20/02